UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIZABETH A. GASS and
DEBORAH DEJONGE,

        Plaintiffs,

v.

MARRIOTT HOTEL SERVICES, INC.
and ECOLAB, INC.,

        Defendants.

_____/

File No.  1:05-CV-856

HON. ROBERT HOLMES BELL

## **O P I N I O N**

    This is a negligence action in which Plaintiffs allege that they suffered chemical poisoning as a result of Defendants' spraying of pesticides in their hotel room.  Defendants have filed motions for summary judgment, to strike expert witnesses, and to strike affidavit and other evidence.  For the reasons that follow, judgment will be entered in Defendants' favor.

### I.

    Plaintiffs Elizabeth A. Gass and Deborah DeJonge were guests at Defendant Marriott Hotel Services, Inc.'s Wailea Marriott Hotel ("Hotel") in Maui, Hawaii from August 31, 2004 to September 7, 2004.  The Hotel received pest control services from Defendant Ecolab, Inc. ("Ecolab").  Ecolab treated guest rooms at the resort on a quarterly basis.  (Medeiros Dep.

at 36). In addition, Ecolab would address additional pest elimination issues that were noted by the housekeeping department on a "service request log."

On September 6, 2004, Plaintiff DeJonge reported to housekeeping that there was a dead cockroach by the sliding door of Plaintiffs' room, Room 1400. (Pl. Ex. A). The cockroach was removed and the incident was reported on the Ecolab service request log. (Pl. Ex. B).

On September 7, 2004, three representatives of Ecolab came to the Hotel to perform routine quarterly servicing of certain guest rooms. After completing the quarterly servicing they checked the service request log and noted a reference to the cockroach in Plaintiffs' room. (Medeiros Dep. at 54).

Defendants have presented evidence that two Ecolab employees, Michael Medeiros and Eduard Rivera, knocked on the door to Room 1400. (Medeiros Dep. at 54). They received no response so they entered with the master key provided by the Hotel. In less than a minute, and before they had started spraying, Plaintiff DeJonge entered the room. They advised her that they were there to spray because of the cockroach report and asked if they could spray. Plaintiff DeJonge did not respond to their question. Rivera sprayed two quick squirts of the insecticide SSI-50 (similar to Raid) from a 13 ounce aerosol can: one squirt to the underside of the countertop and one squirt on the side of the refrigerator. Plaintiff DeJonge became very upset, so Medeiros told Rivera to stop spraying and they left the room. (Medeiros Dep. at 54-59, 62-63).

2

Plaintiffs' evidence regarding Defendants' activities in their room varies greatly from Defendants' evidence.  Plaintiff DeJonge testified that on September 7 she and Plaintiff Gass had been lounging outside.  When she returned to the room through the sliding door there were three men standing in her room, two of whom were wearing masks, had tanks on their backs, and were spraying pesticides from the tanks with a spray wand attachment.  The room was cloudy and had a thick, rancid, acrid odor.  (DeJonge Dep. at 85-86;101-05).  Plaintiff DeJonge stayed by the sliding door and yelled at the men to stop spraying.  They stopped for a moment, but then resumed spraying.  When she threatened to call the hotel manager they stopped spraying and left the room.  (DeJonge Dep. at 85-86, 101-05).

Plaintiff DeJonge used the telephone in the room to call the front desk and asked the manager to come immediately.  She waited for the manager outside.  (DeJonge Dep. at 114).  When the manager arrived she spoke to him outside.  She told him that when she asked to have the roach removed she did not want the room treated.  (Ex. D).  She complained that the spraying might have ruined her belongings, that the smell was making her sick and that she needed a new room.  (DeJonge Dep. at 115).  After he agreed to move Plaintiffs to another room Plaintiff DeJonge went to explain the situation to Plaintiff Gass.  (DeJonge Dep. at 127-28).  Plaintiff Gass did not get excited and the more Plaintiff Gass discounted the magnitude of the situation, the more excited Plaintiff DeJonge became because she was starting to feel ill.  (DeJonge Dep. at 128).  Plaintiffs returned to their room, quickly packed

their luggage, and waited in the hallway for the Hotel Manager to return.  (DeJonge Dep. 132-33).

After moving their luggage to another room both Plaintiffs began to feel sick. Plaintiffs called the front desk complaining of numbness to their tongues, stomach aches, and seeing stars. (Pl. Ex. C, D).  The Hotel arranged for them to be transported to a doctor.  The doctor gave the Plaintiffs prednisone and advised them to drink a lot of water.   (Pl. Ex. D, S, Z).  Plaintiffs flew home to Michigan later that day.

Since their return to Michigan Plaintiffs have received medical and psychological treatment for their continuing complaints of facial swelling, nausea, diarrhea, headaches, discolored tongues, memory loss, mental confusion, blurred vision, fatigue, joint pain, mood swings, hormonal issues, chemical sensitivity, rashes, skin lesions, body aches, and dizziness. (Pl. Ex. S, T, U, V, AA, HH).

Plaintiffs filed this three-count complaint alleging that Defendants negligently allowed dangerous chemicals to be sprayed inside their hotel room while it was still occupied by Plaintiffs and their belongings, and that this negligence caused Plaintiffs to suffer chemical poisoning and other damages associated with that poisoning.

Defendants have filed a motion for summary judgment, a motion to strike experts, and a motion to strike affidavits.

4

## II.

Defendants move to strike Plaintiffs' experts for failure to make a timely or adequate Rule 26 disclosure.

The March 7, 2006, Case Management Order required Plaintiffs to identify their experts by May 15, 2006, and to provide their Rule 26(a)(2) written expert reports by July 1, 2006. (Docket # 11). Discovery was scheduled to close on December 15, 2006. On May 15, 2006, Plaintiffs filed their Rule 26 disclosures and disclosure of expert witnesses, and identified Tom D'Muhala and Timothy J. Gibb, Ph.D. as their liability experts. (Docket # 26 & 27). Plaintiffs advised that Dr. Gibb would testify regarding the procedure the Defendants used with respect to the chemical applications, the dangers associated with those chemicals, ventilation issues, safety procedures which should have been followed and Defendants' negligence with respect to the chemical application, the lack of safety for hotel guests and the actions of Defendants thereafter which resulted in the Plaintiffs' damages. Plaintiffs attached the curriculum vitae of Dr. Gibb.

Plaintiffs did not file any written expert reports by the July 1, 2006 deadline. Defendants advised Plaintiffs by letter dated August 8, 2006, that based upon Plaintiffs' failure to produce expert reports Defendants had concluded that Plaintiffs did not intend to use any testifying experts.

It was not until November 14, 2006 that Plaintiffs sent Defendants a copy of a report prepared by Dr. Gibb. In that report Dr. Gibb noted generally that without information

concerning the rate and application of the chemical, he could not state that the label was violated.  He listed some unanswered questions, and then noted:

> General standard of care when using insecticides dictates that persons/guests should not be present when an insecticide aerosol application is made.  This is not a legal standard but rather an ethical standard that is accepted throughout the industry.  It is clear that this standard was breached in the case of your clients.

(Pl. Resp. to Mot. to Strike, Ex. 2).  In response to Defendants' motion for summary judgment Plaintiffs have submitted an additional letter from Dr. Gibb.  (Pl. Resp. Mot. to Strike Ex. 7).  Dr. Gibb notes in this handwritten letter dated February 13, 2007, that it remains unclear as to what exact pesticides may or may not have been applied in the room, and that "individual differences in reactions and symptoms expressed are directly related to dose, time of exposure and specific chemicals to which a person is exposed." (Pl. Resp. Mot. to Strike Ex. 7) .  With respect to the standard of care, Dr. Gibb listed some general rules on the manner in which pesticides should be applied to public sensitive areas, including hotel rooms.  (Pl. Resp. Mot. to Strike Ex. 7).

Plaintiffs have not provided any written report from Mr. D'Muhala.  Plaintiffs now advise that if they call Mr. D'Muhala, it will only be in rebuttal to the testimony of Defendants' experts.  (Pl. Resp. to Mot. to Strike at 6).

Rule 26(a) of the Federal Rules of Civil Procedure requires an expert witness to provide a written report containing, inter alia "a complete statement of all opinions to be expressed and the basis and reasons therefor."  FED. R. CIV. P. 26(a)(2)(B).  The disclosures

are intended to eliminate surprise, to avoid unnecessary depositions, to reduce costs, and to enhance the court's gatekeeping role. *Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998); FED. R. CIV. P. 26 Advisory Committee Notes, 1993 Amendments, Paragraph (2).   The conclusory Gibbs reports, in addition to being untimely, are utterly lacking in the detail required by Rule 26(a)(2).  They do not disclose "a complete statement of all opinions to be expressed," nor do they disclose "the basis and reasons" for his opinions, the "data or other information" he considered in forming his opinions, the compensation he is to be paid, or a listing of other cases in which he has testified as an expert.  FED. R. CIV. P. 26(a)(2)(B).

Plaintiffs admit that their expert report was untimely, but contend that the untimely disclosure was due to late discovery responses from Defendants.  They also note that Defendants also submitted late expert reports.

If a party without substantial justification fails to disclose information required by Rule 26(a), that party "is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."  FED. R. CIV. P. 37(c)(1).  "The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Dickenson v. Cardiac and Thoracic Surgery of Eastern Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004) (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)).  Plaintiffs' asserted excuses do

not provide substantial justification for their failure to comply with the provisions of Rule 26(a)(2).

Defendants also object to Plaintiffs offering any of their physicians as experts because Plaintiffs failed to provide any Rule 26(a)(2) report for any of the physicians they identified as having provided treatment to Plaintiffs.

Plaintiffs' expert witness disclosure indicated Plaintiffs' intent to rely on the physicians referenced in their Rule 26 disclosures.  (Docket # 27).  Plaintiffs disclosed the names of twelve individuals or institutions that provided healthcare to Plaintiffs, and identified Drs. Natzke, DeJonge, Moore and DeBoe as the primary physicians who have treated Plaintiffs for the chemical contamination issues.  Plaintiffs disclosed that the doctors listed "will testify regarding the treatment they have rendered to the Plaintiffs as a result of the at issue incident and their health prior to said chemical contamination."  (Docket # 26 at 7).

The precise scope of Defendants' request to strike the testimony of Plaintiffs' physicians is not clear.  Plaintiffs correctly note that it is generally understood that "a treating physician . . . can be deposed or called to testify at trial without any requirement for a written report."  FED. R. CIV. P. 26, Advisory Committee Notes, 1993 Amendments. Paragraph (2). Although a treating physician is not required to file an expert report about treatment, there is a split of authority as to whether an expert report is required when a physician's testimony exceeds the scope of treatment and ventures into more general expert opinion testimony. See Musser, 356 F.3d at 758 n.3 (and cases cited therein).  See also Rogers v. Detroit Edison

*Co.*, 328 F. Supp. 2d 687, 689-90 (E.D. Mich. 2004) ("a Rule 26(a)(2)(B) report is not required from a treating physician unless the physician will testify to matters learned outside the scope of treatment.").

The Sixth Circuit has recently clarified the appropriate analytical framework for physician expert testimony in *Fielden v. CSX Transportation, Inc.*, No. 05-4377, — F. 3d —, 2007 WL 1028941 (6th Cir. Apr. 6, 2007). In *Fielden* the court held that under the circumstances of that case the district court erred in excluding the physician's testimony as to the cause of the plaintiff's carpal tunnel syndrome. The court noted that under Rule 26(a)(2)(B) a party needs to file an expert report from a treating physician only if that physician was "retained or specially employed to provide expert testimony," *id.* at *3, and determined that there were no grounds to hold that the physician had functioned as a retained expert in that case. *Id.* at *5.

*Fielden* teaches that the need for an expert report from physicians depends on factors such as whether the physicians were retained to provide expert testimony, whether they formed their opinions on causation at the time of treatment or in anticipation of litigation, whether the lack of a report would implicate Rule 26(a)'s purposes of avoiding surprise and unnecessary depositions, whether there is room for debate as to causation, and whether the physician will testify to issues beyond those covered in ordinary medical training. *Id.* at *4-*6. Defendants' motion addresses all of Plaintiffs' physicians together. In light of *Fielden* it would be error for this Court to strike all of Plaintiffs' physicians from testifying as to

causation merely because Plaintiffs failed to file their expert reports.  The Court is required to consider the testimony of each physician individually.

Accordingly, Defendants' motion to strike expert opinion will be granted in part and denied in part.  It will be granted with respect to Dr. Gibbs' and Mr. D'Muhala's opinions, and denied with respect to the treating physicians, without prejudice to Defendants' right to challenge the physicians' testimony on an individual basis.

### III.

Defendants have also filed a motion to strike affidavit and other inadmissible exhibits relied on by Plaintiffs in opposition to Defendants' motions for summary judgment. Defendants contend that opinion testimony from Plaintiffs'  treating physicians on the issue of causation should be stricken for failure to file expert reports and because they are not qualified to give expert opinions on the issue of causation.

In response to Defendants' motion to strike Plaintiffs have presented the affidavit of Gerald Natzke, D.O., board certified in Environmental Medicine, who has been treating Plaintiffs since October 2004.  Dr. Natzke diagnosed their condition as acute pesticide exposure.  (Natzke Aff. ¶¶ 5, 7).  Dr. Natzke relates Plaintiffs' symptoms, chemical sensitivity, and treatment to the pesticide poisoning they sustained in Hawaii on September 7, 2004.  (Natzke Aff. ¶¶ 5, 13, 14).

Plaintiffs have also presented excerpts from the deposition testimony of Robert A. DeJonge, D.O., Plaintiff DeJonge's husband, who has been treating both women and has

placed them on a detoxification program for their exposure to toxins at the Hotel on September 7, 2004.  (DeJonge Dep. at 68-69, 122-23).

As noted above, a treating physician is not generally required to file an expert report unless he is functioning as a retained expert in the case.  *Fielden*, 2007 WL 1028941 at *5. As noted in *Fielden*, "doctors may need to determine the cause of an injury in order to treat it."  2007 WL 1028941 at *3.  Thus, they may be able to testify as to causation, even without an expert report, if they formed their opinions as to causation at the time they treated the plaintiff rather than at the request of counsel.  *Id.*

Because there is room for serious debate on the issue of causation in this case, the lack of an expert report from these doctors has an effect on Rule 26(a)'s purpose of allowing adequate and efficient case preparation and preventing surprise.  *See Fielden*, 2007 WL 1028941 at * 4.  Nevertheless, it appears that the doctors' causation determinations were made at least in part for purposes of treatment rather than in preparation for trial, and it further appears that the doctors' diagnosis of multiple chemical sensitivities related to the September 7, 2004, incident in the Hotel was revealed to Defendants during the course of discovery.  Accordingly, the Court concludes that the lack of expert reports should not prevent the treating physicians from testifying as to causation to the limited extent that their opinions about the cause of Plaintiffs' injuries was a necessary part of their treatment.  *See Fielden*, 2007 WL 1028941 at * 3 (citing cases).

Defendants challenge the admissibility of these doctors' opinions, however, not only for lack of expert reports, but also because they lack sufficient scientific foundation. Defendants note that neither Dr. Natzke nor Dr. DeJonge is a toxicologist, pharmacologist, chemist, allergist, immunologist or oncologist, and that therefore they are not qualified to testify that Plaintiffs' exposure to pesticides at the Hotel on September 7, 2004, is causally connected to their claimed ailments.

Admissibility of expert opinions under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), is a separate consideration from the need for an expert report. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. In applying Rule 702 "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Pursuant to *Daubert* the Court should consider the following factors in determining the admissibility of expert testimony:

> (1) whether the reasoning or methodology underlying the expert's testimony is scientifically valid; and (2) whether that reasoning or methodology properly could be applied to the facts at issue to aid the trier of fact.

*United States v. Smithers*, 212 F.3d 306, 315 (6th Cir. 2000).

12

In response to Defendants' *Daubert* challenge Plaintiffs have presented the affidavit of Dr. Natzke.  According to Dr. Natzke, Plaintiffs' blood tests did not reveal any detectable levels for the products the lab tested for, which included pyrethroids, which are used in many pesticides.  (Natzke Aff. ¶ 8).  Dr. Natzke does not know what chemical they were exposed to (Natzke Dep. ¶ 9).  Nevertheless, he explained that he related the Plaintiffs' symptoms to the pesticide contamination they sustained at the Hotel on September 7, 2004,

> based upon the history they gave me, the lack of any such symptoms prior to the exposure, the immediate onset of symptoms after this exposure resulting in subsequent medical treatment and the ongoing complaint of such symptoms from the date of the exposure until I saw them in mid-October.  In addition, my opinion is based upon my years of experience in treating thousands of patients exposed to chemical contamination, including pesticides.

(Natzke Aff. ¶ 16).  In addition, Dr. Natzke has stated his belief that "as a result of the chemical contamination that Mrs. Gass and Mrs. Dejonge sustained on September 7, 2004, while in Hawaii, they are now at an increased risk for cancer, especially breast cancer as well as at risk for an auto-immune disease."  (Natzke Aff. ¶ 15).

Dr. DeJonge also has no personal knowledge of what chemicals Plaintiffs were exposed to.  (R. DeJonge Dep. at 67-69).  "What toxins she's been exposed to is the big mystery as far as I'm concerned."  (R. DeJonge Dep. at 67)  He nevertheless has opined that Plaintiffs were poisoned by the pesticides they were exposed to on September 7, 2004, and that this exposure has resulted in their black and green tongues, an increased risk for all cancers, and Plaintiff DeJonge's auto-immune disease.  (R. DeJonge Dep. at 67, 69, 122-25).

13

For purposes of this motion the Court does not question that Dr. Natzke and Dr. DeJonge are experienced physicians and are qualified to diagnose medical conditions and treat patients. "The ability to diagnose medical conditions is not remotely the same, however, as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions." *Wynacht v. Beckman Instruments, Inc*., 113 F. Supp. 2d 1205, 1209 (E.D. Tenn. 2000).

Dr. Natzke and Dr. DeJonge have not based their causation opinions on any testing data. The only blood tests Dr. Natzke relied on did not reveal any detectable levels for the products the lab tested for, which included pyrethroids used in many pesticides. (Natzke Aff. ¶ 8). Neither have Plaintiffs' doctors related their causation opinions to any scientific or medical studies or literature. The only literature referenced in Dr. Natzke's affidavit is an article entitled "Experiences Living with Multiple Chemical Sensitivities." The article discusses the symptoms experienced by those who have been diagnosed with Multiple Chemical Sensitivities ("MCS"). Dr. Natzke asserts that many, if not all, of the symptoms and conditions referenced in the article apply to Plaintiffs. (Natzke Aff. ¶ 14). Notably, however, the article does not support Dr. Natzke's causation opinion because the article does not address the cause of MCS.

"Under the *Daubert* standard, epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound." *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 2004).

14

The causation opinions expressed by Dr. Natzke and Dr. DeJonge are based largely on the perceived temporal connection between Plaintiffs' exposure and the onset of their symptoms. In *Wynacht* the court held inadmissible a doctor's causation opinion based upon a similar temporal connection:

> In short, Dr. Ziem's opinion that the chemicals present in the Synchron CX-7 caused Wynacht's fibromyalgia, chronic fatigue syndrome, toxic encephalopathy, and other health problems, is based solely on the temporal relationship between the January chemical spill, burning sensations reported by Wynacht, and Dr. Ziem's subsequent diagnosis of eighteen maladies. Given the complex nature of the facts giving rise to this litigation, this perceived temporal connection, especially given Dr. Ziem's failure to identify any biochemical, medical, or toxicological principles or studies supporting it, falls well short of the *Daubert* reliability standard. Dr. Ziem's methodology simply does not reflect the intellectual rigor required of experts pursuant to Rule 702.

113 F. Supp. 2d at 1209 (citations omitted). The *Wynacht* court also noted that "[w]ithout testing data or support in scientific or medical literature, the Court cannot say with any confidence whether her reasoning would have any acceptance in the medical or scientific communities." *Id.* at 1210.

"A temporal connection standing alone is entitled to little weight in determining causation." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 670 (5th Cir. 1999). "However, a temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link." *Id.* In *Curtis* the court permitted the doctor to testify as to causation where there was not only a strong temporal connection between the refinery workers' exposure to benzene and the onset of symptoms, but also a subsidence of symptoms when the plaintiffs

15

left the refinery, and scientific literature establishing a connection between benzene and the symptoms experienced by the plaintiffs. *Id.  See also Heller v. Shaw Indus., Inc*., 167 F.3d 146, 158-59 (3d Cir. 1999) (affirming exclusion of doctor's causation testimony based on unreliable temporal relationship and no scientific studies).  Plaintiffs' treating doctors have not referenced any scientific literature establishing a connection between Plaintiffs' exposure to some unknown pesticide and symptoms that they continue to experience over two years after the exposure.  Their reliance on the temporal connection is accordingly entitled to little weight.

Another appropriate method for making a determination of causation for an individual instance of disease is known as "differential diagnosis," defined as:

> [t]he method by which a physician determines what disease process caused a patient's symptoms.  The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history.

*Hardyman v. Norfolk & Western Railway Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 214 (1994)).  *See also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999) (" a reliable differential diagnosis provides a valid foundation for an expert opinion.").  The conclusory submissions from Dr. Natzke and Dr. DeJonge, however, are not sufficient to show that their conclusions are the result of a reliable differential diagnosis.  *See, e.g., Westberry*, 178 F.3d at 265 ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.").

Plaintiffs suggest that Dr. Natzke is qualified to testify as to causation because he has treated over 1,000 other patients for chemical and/or pesticide exposure. A doctor may be able to support his conclusions by reference to his "education, training, and experience." However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702, Advisory Committee Notes, 2000 Amendments. In *In re Meridia Products Liability Litigation*, 328 F. Supp. 2d 791 (N.D. Ohio 2004), *aff'd*, 447 F.3d 861 (6th Cir. 2006), the court excluded the causation testimony from a doctor who did not provide the court with more than conclusory statements regarding his opinions. *Id.* at 806. Although Dr. Natzke supports his causation opinion by reference to his years of experience, his explanation, like the explanation of the doctor in *In re Meridia*, is too conclusory to satisfy the requirements of *Daubert*.

In light of the treating physicians' lack of knowledge concerning what chemicals Plaintiffs' were exposed to, the lack of diagnostic tests verifying exposure to any particular chemicals, the lack of scientific literature supporting a link between exposure to pesticides in general with the ongoing symptoms described by Plaintiffs, and the failure to address other potential causes of Plaintiffs' symptoms, the Court concludes that Dr. Natzke and Dr. DeJonge have not demonstrated a scientifically reliable method to support their conclusions as to causation in this particular matter and may not be permitted to testify as to

17

the cause of Plaintiffs' symptoms.  Although their causation conclusion is excluded as

unreliable, they may still be permitted to testify to Plaintiffs' symptoms, tests, diagnosis, and

treatment.  *See Heller v. Shaw Industries, Inc*. 167 F.3d 146, 159 n.8 (3rd Cir. 1999) (noting

that treating physician, whose causation conclusion is excluded as unreliable, should have

been permitted to testify about examination, tests and diagnosis).

## IV.

With these evidentiary rulings in mind, the Court will turn to Defendants' motion for

summary judgment.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

proper if there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law.  In evaluating a motion for summary judgment the Court must

look beyond the pleadings and assess the proof to determine whether there is a genuine need

for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If

Defendants carry their burden of showing there is an absence of evidence to support a claim

then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and

admissions on file, that there is a genuine issue of material fact for trial.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence

and draw all reasonable inferences in favor of the nonmoving party.  *Minges Creek, L.L.C.

v. Royal Ins. Co. of America*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475

U.S. at 587).   Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff.  *Id.  See generally, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

Plaintiffs allege that the Hotel and Ecolab were negligent in spraying the room with dangerous chemicals while it was still occupied and that as a result of their actions Plaintiffs have suffered chemical poisoning.

A federal court sitting in diversity applies the choice-of-law provisions of the forum state.  *NILAC Int'l Mktg. Group v. Ameritech Servs., Inc*., 362 F.3d 354, 358 (6th Cir. 2004) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Under Michigan choice of law principles, the law of the forum applies unless there is a "rational reason" to displace it.  *Olmstead v. Anderson*, 428 Mich. 1, 24, 400 N.W.2d 292 (1987).  Defendants have asserted that Michigan law applies and Plaintiffs have not suggested any rational reason to displace it with the law of Hawaii or any other state.  Accordingly, the Court assumes that Michigan law governs this controversy.

Plaintiffs claim that they have been injured because of Defendants' negligence in exposing them to pesticides.  In order to make out their negligence claims Plaintiffs must prove "(1) that defendant owed them a duty of care, (2) that defendant breached that duty, (3) that plaintiffs were injured, and (4) that defendant's breach caused plaintiffs' injuries."

*Henry v. Dow Chemical Co.*, 473 Mich. 63, 71-72, 701 N.W.2d 684, 688 (2005). Plaintiffs' claims that they suffered medical complications as a result of their exposure to a toxic substance are known as toxic tort claims. *Id.* at 67.

The parties have presented conflicting evidence as to what chemicals and what quantity of chemicals were applied to Plaintiffs' room. Because the Court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party, *Minges Creek*, 442 F.3d at 955-56, for purposes of this motion the Court will assume that the facts are consistent with the evidence presented by Plaintiffs. In other words, for purposes of this motion the Court will assume that Defendants were advised not to spray the room, that they did not receive permission from Plaintiffs to spray the room, and that they nevertheless sprayed chemicals from their tanks onto the floor throughout the room.

**A. Duty of Care**

Defendants contend that Plaintiffs cannot sustain their burden of proving that Marriott or Ecolab breached any duty of care owed to Plaintiffs. In support of this contention Defendants note that professional pest elimination services are highly regulated, (Def. Ex. 7, Dr. Gary Bennett Rpt. at 1-2), and that expert testimony is generally required to establish the applicable professional standard of conduct and its breach. *Phillips v. Mazda Motor Mfg. (USA) Corp.*, 204 Mich. App. 401, 409-10, 516 N.W.2d 502, 507 (1994). Defendants contend that they are entitled to summary judgment because Plaintiffs have failed to produce any competent, admissible expert testimony establishing that Marriott or Ecolab breached a

relevant standard of care in connection with the application of an insecticide in Plaintiffs' hotel room on September 7, 2004.

Plaintiffs respond that under Hawaii law hotels have a duty to protect their guests from unreasonable risk of physical harm, and a determination of whether a risk is reasonable or unreasonable and whether the defendant's conduct was reasonable in the circumstances are issues for the jury to decide. *Corbett v. Assoc. of Apt. Owners of Wailua Bay View Apts.*, 772 P.2d 693, 694-95 (Haw. 1989); *Knodle v. Waikiki Gateway Hotel, Inc.*, 742 P.2d 377, 384 (1987). Plaintiffs have also presented evidence that spraying pesticides while a guest is in the room and without the guest's consent was contrary to the policies of Ecolab and the Hotel.

Because Plaintiffs' theories are all premised on the harmful nature of the chemicals used, and because Plaintiffs do not have a witness who can give an expert opinion on the harmful nature of the chemicals, it appears to this Court that even if Plaintiffs can show that the spraying was not authorized and was against Defendants' own policies, Plaintiffs cannot show that the risk of spraying was unreasonable. Nevertheless, even if Court assumes that Plaintiffs have come forward with sufficient evidence to establish an issue of fact as to breach of a duty of care, that still begs the question as to whether that breach was the cause of Plaintiffs' injuries.

**B. Causation**

Defendants contend that Plaintiffs cannot meet their burden of proving causation because Plaintiffs have failed to offer any expert testimony establishing that Defendants' conduct caused Plaintiffs' claimed illnesses.

Causation does not always require expert testimony.  "It is well settled that expert testimony is unnecessary in cases where jurors 'are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'"  *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2nd Cir. 2004) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)).  "Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, '[e]xpert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.'"  *Id.*  (quoting *Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987)).  In a case where an injury has multiple potential etiologies, expert testimony is necessary to establish causation.  *Id.*  Thus, in cases involving technical or scientific principles beyond the knowledge of the ordinary person, causation may only be established through competent, admissible expert testimony.

Toxic tort cases fall within the class of cases that typically require expert testimony to establish causation:

> Toxic tort cases present a unique challenge to the classical conception of causation.  Other tort cases, such as slip-and-fall or car accident cases, feature scenarios where causation is fairly obvious-if one car collides with another, common sense dictates that a range of injuries from broken limbs to internal

22

bleeding to death can result. Toxic tort cases, however, generally involve less-common injuries that often function at the cellular level. The causation inquiry in toxic tort cases is more complicated because the injuries themselves are usually not immediately obvious and the connection between exposure and injury is not a matter of common sense or everyday experience. Moreover, a variety of exposures frequently can associate with the condition.

*In re Meridia*, 328 F. Supp. 2d at 798. In *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1297 (11th Cir. 2005), the plaintiff alleged exposure to an allegedly defective pesticide. The court noted that "[t]oxic tort cases . . . are won or lost on the strength of the scientific evidence presented to prove causation," and held that the grant of summary judgment was appropriate because "sufficient evidence of causation was lacking without the expert testimony." *Id.* at 1297. *See also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1226 (10th Cir. 2003) ("As is true in most any toxic tort action, the outcome of this case indisputably hinges on the testimony of experts.").

"To prove causation in a toxic tort case, a plaintiff must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury." *Bonner v. ISP Techs. Inc.*, 259 F.3d 924, 928 (8th Cir. 2001) (citing *Mitchell v. Gencorp*, 165 F.3d 778, 781 (10th Cir. 1999). "In other words, the plaintiff must put forth sufficient evidence for a jury to conclude that the product was capable of causing her injuries, and that it did." *Id. See also McClain v. Metabolife Intern., Inc.* 401 F.3d 1233, 1241 (11th Cir. 2005) (holding that in toxic tort cases, "[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities

are minimal facts necessary to sustain the plaintiff's burden. . . ."); *In re Meridia*, 328 F. Supp. 2d at 798 ("First, a plaintiff must show that the substance to which she was exposed can cause the type of injury alleged.  Next, a plaintiff must show that in her case, exposure to the substance actually caused the alleged injury.").

"[A] plaintiff must prove level of the exposure using techniques subject to objective, independent validation in the scientific community." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).  "At a minimum, the expert testimony should include a description of the method used to arrive at the level of exposure and scientific data supporting the determination.  The expert's assurance that the methodology and supporting data is reliable will not suffice." *Id.*  "Absent supporting scientific data, any estimates or conclusions are "little more than guesswork. Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Id.*

Plaintiffs are correct in their contention that the case law does not always require evidence of the precise level of exposure to a toxic substance:

> [W]hile precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

*Westberry*, 178 F.3d at 264.  Nevertheless, none of the cases Plaintiffs have cited have dispensed with the need for some evidence of the harmful level of exposure and the plaintiff's exposure to support an expert's opinion on causation.  As noted in *Curtis*, "Scientific

24

knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." 174 F.3d *Id.* at 670 (quoting *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)). While a plaintiff need not produce a mathematically precise table equating levels of exposure with levels of harm, a plaintiff must still make "a threshold showing that he or she was exposed to toxic levels known to cause the type of injuries he or she suffered." *Mattis v. Carlon Elec. Products*, 295 F.3d 856, 860-61 (8th Cir. 2002).

Thus, in *Westberry* the court held that the plaintiff's expert did not have to point to a specific level of exposure to airborne talc where there was no dispute that exposure to high concentrations of airborne talc could cause irritation to mucous membranes and there was evidence of a "substantial exposure." *Id.* In *Curtis* the court determined that the expert had adequate support for his general causation opinion that exposure to benzene at levels of 200-300 ppm would cause the injuries suffered by plaintiffs and for his finding that the refinery workers were exposed to benzene at levels several hundred times the permissible exposure level of 1 ppm. *Curtis*, 174 F.3d at 670 & 672. In *Bonner*, the court held that the expert did not need to quantify the amount of toxin to which the plaintiff was exposed where there was sufficient evidence to show that the plaintiff was exposed to a quantity that exceeded safe levels. 259 F.3d at 931.

Plaintiffs' ability to meet their burden of proof is severely compromised by the fact that they do not even know what chemicals they were exposed to. For purposes of this motion, however, the Court has assumed that the chemicals were sprayed from tanks. Plaintiffs have presented evidence that the tanks were customarily used to spray Demand CS and/or Suspend SE insecticide. (Medeiros Dep. at 145). Accordingly, the Court will assume that Plaintiffs were exposed to one of these chemicals.

Plaintiffs do not, however, have any expert witness who can testify that these chemicals are capable of causing injuries like those suffered by Plaintiffs. Neither have they produced any expert testimony as to what a harmful level of exposure to these chemicals might be, or whether Plaintiffs were exposed to a sufficiently harmful level to bring about their injuries. Although Plaintiffs have provided the material safety data sheets ("MSDS") on these products, (Pl. Supp. Mem., Ex. 2-4), these disclosures do not indicate what a toxic level of exposure might be, nor do they suggest that the products in any dosage are capable of causing the long-term effects Plaintiffs claim they have suffered as a result of their minimal exposure. In short, Plaintiffs have not produced any expert evidence that the products are capable of causing their injuries, nor that they did in fact cause their injuries.[1]

---

[1]Even if the Court allowed the testimony of Plaintiffs' proposed liability expert, Dr. Gibbs, the result would not be different because his expert opinion addresses only the standard of care, and contains no opinion on the issue of causation. Moreover, because Rule 26(a)(2)(b) requires an expert report to contain "a complete statement of all opinions to be expressed," it is proper to exclude opinions not expressed in the expert report. *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005). Similarly, even if Plaintiffs' physicians were permitted to testify as to causation, they are not in a position to

Plaintiffs assert that even without expert testimony there is sufficient circumstantial evidence to support their claims that they sustained chemical contamination at the Hotel on September 7, 2004, which has resulted in their ongoing symptoms and treatment. They note that this case involves two genetically different individuals who suffered exposure to the same chemical product, had an immediate onset of symptoms, and have continued to have the same symptoms thereafter. Plaintiffs note that their doctors will testify that their symptoms are consistent with chemical poisoning. They also note that their symptoms are consistent with the health hazards referenced in the MSDS for Demand CS Insecticide and Suspend SC Insecticide. (Pl. Supp. Mem. at 9).

Even if Plaintiffs can show that their symptoms are "consistent with" exposure to a particular chemical, such a showing would not satisfy their burden of proof as to causation. In *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349 (6th Cir. 1992), the Sixth Circuit held that proof that Bendectin is "capable of causing," "could cause" or that its effects are "consistent with causing" birth defects, was evidence of a possibility rather than a probability, and was not sufficient to support a finding of causation. *Id.* at 1359-60. Similarly, in *Conde v. Velsicol Chemical Corp.*, 24 F.3d 809 (6th Cir. 1994), the court held that the experts' testimony that chlordane exposure "is consistent with" the plaintiffs'

---

provide the information necessary to sustain Plaintiffs' burden of proof. They do not have the expertise to provide a reliable expert opinion on whether one or more of the chemicals could cause the type of injury alleged, the minimum exposure necessary to cause injury, or the level of Plaintiffs' exposure.

27

observed symptoms left too wide an analytical gap to permit an inference to be drawn on the ultimate issue of medical causation. *Id.* at 814. *See also Kolesar v. United Agri Products, Inc.*, 412 F. Supp. 2d 686, 698 (W.D. Mich. 2006) (Enslen, S.J.) (holding that expert's opinion that plaintiff's reported symptoms were "consistent with" possible consequences of metam sodium exposure did not make more likely or not a conclusion that plaintiff was injured due to chemical exposure). When the analytical gap between the evidence presented and the inferences to be drawn is too wide, a jury should not be asked to speculate on the issue of causation. *Kalamazoo River Study Group v. Rockwell Intern. Corp.*, 171 F.3d 1065, 1073 (6th Cir. 1999).

Plaintiffs' lack of evidence on the issue of causation is particularly striking in light of the unrebutted and substantial evidence presented by Defendants showing the lack of any link between Plaintiffs' non-specific constellation of symptoms to a limited exposure to pesticides and the unconventional nature of the diagnosis and treatment they have been receiving. (Prelim. Expert Reports of Dr. Gary Bennett, Dr. Marcia van Gemert, Dr. H. James Wedner and Dr. Elissa P. Benedek, Def. Exs. 7, 10, 13, 15 & 16).

Plaintiffs have not come forward with evidence to permit a jury to find the chemicals to which they were exposed and the duration of their exposure was **capable** of causing the types of injuries Plaintiffs' allege, much less that these chemicals were **in fact** responsible for their injuries. Because Plaintiffs cannot sustain their burden of proving that any alleged

28

breach of a relevant standard of care by Marriott or Ecolab was the cause of their injuries,

Defendants are entitled to summary judgment on Plaintiffs' claims against them.

    An order and judgment consistent with this opinion will be entered.


Dated:    May 7, 2007          /s/ Robert Holmes Bell              
                                          ROBERT HOLMES BELL
                                          CHIEF UNITED STATES DISTRICT JUDGE